IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| **RODNEY HEINZMANN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Civil No.**  15-cv-792-CJP[1] |
| | ) | |
| **CAROLYN W. COLVIN,** | ) | |
| **Acting Commissioner of Social** | ) | |
| **Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM and ORDER

**PROUD, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), plaintiff Rodney Heinzmann is before the Court, represented by counsel, seeking review of the final decision of the Commissioner of Social Security denying him Disability Insurance Benefits (DIB).

## Procedural History

Plaintiff applied for benefits on July 2, 2012, alleging disability beginning on December 29, 2011. (Tr. 22-32). After holding an evidentiary hearing, ALJ Karen Sayon determined plaintiff was disabled as of January 9, 2014, but not prior. (Tr. 22-32). The Appeals Council denied review, and the decision of the ALJ became the final agency decision. (Tr. 1). Administrative remedies have been exhausted and a timely complaint was filed in this Court.

---

[1] This case was referred to the undersigned for final disposition upon consent of the parties, pursuant to 28 U.S.C. §636(c).  See, Doc. 7.

## Issues Raised by Plaintiff

Plaintiff raises the following point:

1. The ALJ erred by improperly analyzing the opinions of plaintiff's treating physician.

## Applicable Legal Standards

To qualify for DIB, a claimant must be disabled within the meaning of the applicable statutes. For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." **42 U.S.C. §423(d)(1)(A).**

A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. **42 U.S.C. §423(d)(3).** "Substantial gainful activity" is work activity that involves doing significant physical or mental activities, and that is done for pay or profit. **20 C.F.R. §§ 404.1572.**

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled. The Seventh Circuit Court of Appeals has explained this process as follows:

> The first step considers whether the applicant is engaging in substantial gainful activity. The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. The third step compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of the listed impairments, then the applicant is

> considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues. The fourth step assesses an applicant's residual functional capacity (RFC) and ability to engage in past relevant work. If an applicant can engage in past relevant work, he is not disabled. The fifth step assesses the applicant's RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, he is not disabled.

*Weatherbee v. Astrue*, 649 F.3d 565, 568-569 (7th Cir. 2011).

Stated another way, it must be determined: (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is serious; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience. **20 C.F.R. §§ 404.1520;** *Simila v. Astrue*, **573 F.3d 503, 512-513 (7th Cir. 2009);** *Schroeter v. Sullivan*, **977 F.2d 391, 393 (7th Cir. 1992).**

If the answer at steps one and two is "yes," the claimant will automatically be found disabled if he or she suffers from a listed impairment, determined at step three. If the claimant does not have a listed impairment at step three, and cannot perform his or her past work (step four), the burden shifts to the Commissioner at step five to show that the claimant can perform some other job. *Rhoderick v. Heckler*, **737 F.2d 714, 715 (7th Cir. 1984).** *See also Zurawski v. Halter*, **245 F.3d 881, 886 (7th Cir. 2001)**(Under the five-step evaluation, an "affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled…. If a claimant

reaches step 5, the burden shifts to the ALJ to establish that the claimant is capable of performing work in the national economy.").

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made. It is important to recognize that the scope of review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." **42 U.S.C. § 405(g)**. Thus, this Court must determine not whether plaintiff was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. **See,** ***Books v. Chater***, **91 F.3d 972, 977-78 (7th Cir. 1996)** (citing ***Diaz v. Chater***, **55 F.3d 300, 306 (7th Cir. 1995)**). This Court uses the Supreme Court's definition of substantial evidence, i.e., "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." ***Richardson v. Perales***, **91 S. Ct. 1420, 1427 (1971).**

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. ***Brewer v. Chater***, **103 F.3d 1384, 1390 (7th Cir. 1997)**. However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. See, ***Parker v. Astrue***, **597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.**

<u>**The Decision of the ALJ**</u>

ALJ Sayon followed the five-step analytical framework described above. She determined that plaintiff had not engaged in substantial gainful activity since his alleged onset date. She found that plaintiff had the severe impairments of coronary artery disease, diabetes mellitus, and degenerative disc disease of the lumbar spine. (Tr. 24). The ALJ further determined these impairments do not meet or equal a listed impairment. (Tr. 25).

The ALJ found that plaintiff had the residual functional capacity (RFC) to perform light work but with physical limitations. (Tr. 25). Based on the testimony of a vocational expert (VE), the ALJ found that plaintiff was not able to perform his past work. (Tr. 30). However, he was not disabled until January 9, 2014 because he was able to perform other jobs which existed in significant numbers in the regional and national economies. (Tr. 30-32).

## The Evidentiary Record

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order. The following summary of the record is directed to the points raised by plaintiff.

### 1. Agency Forms

Plaintiff was born on February 10, 1959 and was fifty-two years old on the alleged onset date of December 29, 2011. He was insured for DIB through March 31, 2018. (Tr.178). Plaintiff was five feet five inches tall and weighed two hundred and thirty pounds. (Tr. 182). He completed high school in 1977 and had no further schooling or training. (Tr. 183).

Plaintiff previously worked as a forklift driver and a farmer. (Tr. 192). He stated that his degenerative disc disease, diabetes, and chronic pain limited his ability to work. (Tr. 182). Plaintiff took Celebrex and Flexeril for muscle spasms; Celexa for depression; Demerol for pain; Glucophage and Novolog for diabetes; Lipitor for high cholesterol; Lisinopril and Protonix for high blood pressure; and Ziac as a beta blocker. (Tr. 185, 217, 225).

Plaintiff completed a function report in September 2012. (Tr. 204-12). He stated that his back pain limited his ability to work because he could not walk more than short distances and could only stand for short periods of time. (Tr. 204). On a daily basis, plaintiff stated he ate breakfast, did a load of laundry, fed and gave water to his dogs, watched television, went into town for lunch, and picked up his grandchildren from school. He occasionally had difficulty putting on his pants and socks. (Tr. 205). While he typically went into town for lunch, he prepared himself fried eggs and sandwiches for meals several times a week. (Tr. 206). He was able to drive, handle his finances, and shop for groceries. (Tr. 207). He enjoyed watching local school sporting events but had difficulty sitting in the bleachers or standing. (Tr. 208).

Plaintiff claimed that the pain from his injuries caused him to have difficulty lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, climbing stairs, completing tasks, and concentrating. He stated he could walk fifty feet before needing to rest for ten to thirty minutes. He felt he could follow written and spoken instructions fairly well. (Tr. 209). He had difficulty handling stress but was able to deal with changes in his routine. (Tr. 210). He took

6

fourteen medications at the time he wrote his function report. He stated that he was not sure which medications caused side effects but he was often tired, irritable, and forgetful. (Tr. 211).

## 2. Evidentiary Hearings

Plaintiff was represented by counsel at the evidentiary hearing on January 8, 2014. (Tr. 37-68). Plaintiff was fifty-four at the time of his hearing and lived with his wife and grandchildren. (Tr. 43). His grandchildren ranged in age from ten months old to ten years old and his daughter cared for the infant. (Tr. 43). He was five feet five inches tall and weighed two hundred and forty pounds. He had a driver's license and had no difficulties driving. (Tr. 44).

Plaintiff testified that he owned a car wash but his daughter and her boyfriend were in charge of operations. (Tr. 44). He owned the car wash for five or six years but had never made a profit. He did not do any work for the car wash outside of occasionally stopping by to check on things. (Tr. 45). He also testified that he lived on a one hundred and forty acre farm. (Tr. 45-46). He did not have any crops or livestock on the farm and he rented out the pastureland and tillable acres. (Tr. 45). Plaintiff stated he had not done any work on the farm for at least three years. (Tr. 46). He received long term disability benefits. He last worked two years prior to the hearing as a forklift operator at a warehouse. (Tr. 47).

Plaintiff testified that his lower back issues made him unable to work. He stated that his back pain made it difficult to walk because it radiated down his left hip and into his leg, and his back pain also caused his hands to become

numb. He stated the pain had been present intermittently for three or four years but had become somewhat constant recently. (Tr. 49). He indicated his pain level was at a six at the time of the hearing but if he tried to walk or climb stairs the pain level would increase to ten out of ten. (Tr. 50).

Plaintiff testified that he could walk for five to ten minutes and stand for fifteen to twenty minutes at time. He stated he had been limited to this amount of walking for two or three years. He felt he could lift and carry about five pounds of weight. (Tr. 50). Plaintiff stated that he could sit in an office chair for a half an hour to an hour as long as he had pain pills. (Tr. 50-51). He previously tried injections for his back pain but they did not help a significant amount. He felt his pain medications of Demerol, Flexeril, Advil, Aleve, and Ibuprofen were helpful. (Tr. 51). He did not feel that his medications caused side effects. (Tr. 53). Plaintiff was also diabetic. He was on insulin and took pills to regulate his blood sugar. (Tr. 51). He had a procedure on his heart performed the previous year which allowed him to be able to breathe better and walk a little farther. After his procedure, he no longer had shortness of breath but he still occasionally had chest pain. (Tr. 52).

Plaintiff testified that on a typical day he wakes up around 9 a.m. and got dressed. He then took his medications and checked his blood sugar. Plaintiff would watch television, eat some lunch, and then lie down for a nap. After his nap he would eat dinner with his family and spend time with his grandchildren before going back to sleep around 10 p.m. (Tr. 53-54). Occasionally, for exercise, he walked on a treadmill for six to fifteen minutes if his back was not

hurting too badly. (Tr. 54-55). He testified that he typically woke up several times in the night because of his back pain. He did not have many hobbies beyond watching television and spending time with his grandchildren. (Tr. 54).

A vocational expert (VE) also testified. (Tr. 61-67). The ALJ asked the VE a hypothetical question which comported with the ultimate RFC assessment, that is, a person of plaintiff's age and work history that was able to perform light work but could only occasionally climb, balance, stoop, kneel, crouch, and crawl. (Tr. 63). Additionally, the person could have no concentrated exposure to extreme temperatures. (Tr. 64-65). The VE testified that the person could not perform any of plaintiff's previous work. However, the person could perform jobs that exist in significant numbers in the national economy. Examples of such jobs are storage facility clerk, counter clerk, and laundry folder. (Tr. 64).

The VE also stated that if the individual had to take extra breaks beyond what is normally given to a worker there would not be jobs available. She testified that if an individual was off task more than fifteen percent of the workday or absent more than three days a month the individual could not maintain employment. (Tr. 65). The ALJ noted that if the individual was limited to sedentary work the individual would be disabled due to age. She also noted that plaintiff was approaching fifty-five and would be considered disabled with a light work RFC because he had no transferrable skills. (Tr. 66).

### 3. Medical Evidence

In June 2011, plaintiff had an MRI of his back which indicated he had mild disc bulges at L2-3, L3-4, and L4-5 as well as moderate left-sided neural foraminal stenosis. Additionally, the L3-4 space demonstrated diffuse disc bulge with mild spinal canal stenosis and left side neural foraminal narrowing. (Tr. 368). In August 2011, plaintiff underwent a lumbar discography[2] that indicated he had three-level degenerative disc disease and all levels had a grade V annular tear[3] with degeneration and leak of the contrast into the epidural space. Plaintiff was advised to follow-up with one of his doctors to explore surgical options because plaintiff had been unresponsive to epidural injections, medical management, and physical therapy. (Tr. 364-67).

In September 2011, plaintiff followed-up with his primary care physician, Dr. Robert Frost. Dr. Frost discussed the results of plaintiff's MRI and discography, and referred plaintiff to a specialist for an opinion on his back. (Tr. 362-63). The next month, plaintiff returned to Dr. Frost with back pain. Plaintiff indicated he was frequently calling into work due to his back pain, and two spine surgeons declined to operate on his back. He wore a back brace and corset regularly. (Tr. 358). Dr. Frost indicated plaintiff was going to seek disability because of his back and that Dr. Frost would support his efforts. (Tr. 359). Plaintiff returned to Dr. Frost's office four more times in 2011 for check-

---

[2] Lumbar discography, or a discogram, "is a test used to evaluate back pain." Dye is injected into the disc, "[i]f the dye stays in the center of the disc, the disc is normal. If the dye spreads outside the center of the disc, the disc has undergone some wear and tear." http://www.mayoclinic.org/tests-procedures/discogram/basics/what-you-can-expect/prc-20013848
[3] "An annular tear occurs when the tough exterior of an intervertebral disc (the annulus fibrosus) rips or tears." https://www.laserspineinstitute.com/back_problems/annular_tear/

ups on anemia, a rash, and elbow pain. (Tr. 345-56). At his last visit in 2011, Dr. Frost prescribed Flexeril for plaintiff's back pain. (Tr. 346).

In 2012, plaintiff saw Dr. Frost over ten times. (Tr. 298-344). At his first visit, plaintiff had "severe unrelenting back pain and bilateral hand numbness" and was there to discuss disability due to back pain. He had a slow and antalgic gait. (Tr. 343). Dr. Frost reiterated that plaintiff had been evaluated by two surgeons and was not a surgical candidate. He suspected plaintiff had carpal tunnel syndrome as well due to his intermittent hand numbness. (Tr. 344). In May 2012, plaintiff indicated he could "barely perform" activities of daily living due to his back pain. (Tr. 332). Dr. Frost indicated plaintiff should continue on pain medication and perform activities as tolerated. (Tr. 333). In June, his pain remained the same and Dr. Frost indicated it was "chronic." (Tr. 328-29).

In October 2012, plaintiff followed-up with Dr. Frost for his back pain. He had a normal gait and was well appearing. (Tr. 322-23). From October 2012 through January 2013 plaintiff saw Dr. Frost six times. (Tr. 295-318). Three of the occasions were follow-ups on back pain, but plaintiff was well appearing and in no acute distress. (Tr. 296-97, 300, 311).

In March and May 2013, plaintiff returned to Dr. Frost for his back pain and indicated there was no change in his condition. (Tr. 425-27, 408-10). In June he returned and indicated he was doing very well. (Tr. 405-07). In July plaintiff presented to Dr. Frost with a cough and an antalgic gait. (Tr. 401-04). Plaintiff presented to Dr. Frost six more times on record for a wide variety of

problems. (Tr. 492-513). He had back pain on three of the occasions, but had normal gait on four visits and no sensory loss. (Tr. 497, 501, 505, 509).

### 4. Opinions of Plaintiff's Treating Physician

Plaintiff's treating physician provided four separate opinions regarding plaintiff's capacity to work. Dr. Frost's opinions were dated June 4, 2012, October 29, 2012, February 22, 2013, and April 23, 2013. (Tr. 411-13, 428-33). In his initial evaluation, Dr. Frost noted plaintiff had an antalgic gait and took several pain medications. Dr. Frost stated plaintiff's lower back pain made him able to sit, stand, and walk for a ten minutes at a time and zero hours in a day. (Tr. 432-33). He stated plaintiff could occasionally lift or carry up to ten pounds but could never lift or carry anything heavier. He indicated plaintiff could never bend at the waist, kneel, crouch, or drive. Additionally, plaintiff could occasionally finger but could never reach with either arm. (Tr. 433). His expected duration of plaintiff's limitations was "lifetime" and plaintiff was not a candidate for surgery. (Tr. 433).

Dr. Frost's second opinion indicates that plaintiff's primary diagnosis is severe inoperable degenerative disc disease. Dr. Frost stated plaintiff could sit for one hour at a time and a total of three hours a day, but he could never stand or walk, and he could occasionally drive. Dr. Frost also stated that plaintiff could occasionally reach, finger, and handle bilaterally. The rest of his opinions remained the same from June 2012. (Tr. 430-31).

Dr. Frost's third evaluation form stated plaintiff could sit for one hour at a time and for one hour in an eight hour day; he could never walk or stand.

Plaintiff could occasionally drive, lift or carry up to ten pounds, and reach above his shoulder or at desk level. Plaintiff could never lift or carry over ten pounds, balance, stoop, kneel, crawl, or reach below waist level. Additionally, plaintiff could not handle temperature extremes. (Tr. 428-29).

Dr. Frost's final evaluation indicated plaintiff could sit for a total of two hours in an eight hour day. He could perform repetitive actions like simple grasping and fine manipulation but he could not push or pull. (Tr. 411). Plaintiff could occasionally lift or carry up to ten pounds and occasionally bend. He could never lift or carry over ten pounds and could never squat, crawl, climb, or reach above shoulder level. (Tr. 412). Plaintiff needed a total restriction from unprotected heights, moving machinery, exposure to extreme temperatures, and exposure to dust and fumes. Dr. Frost stated that plaintiff was severely disabled from his back pain and diabetes. (Tr. 413).

### 5. Consultative Examination

Plaintiff had a consultative examination with Dr. Vittal Chapa in October 2012. (Tr. 271-74, 286). Dr. Chapa noted that plaintiff stopped working in December 2011 and seemed to be reliable. Plaintiff indicated he had bulging discs, lower back pain, shortness of breath on exertion, chest pain, diabetes, and was unable to walk long distances. Plaintiff stated his pain was typically a six out of ten and he took several pain medications. (Tr. 271). At the time of examination, plaintiff was five feet five inches tall and weighed two hundred and twenty pounds. (Tr. 272).

Plaintiff had no difficulty getting on and off the exam table and did not use an assistive device to walk. He had mild difficulty tandem walking, moderate difficulty walking on his heels, severe difficulty squatting and arising, and was unable to walk on his heels. (Tr. 286). Dr. Chapa's diagnostic impressions were chronic lumbosacral pain syndrome, coronary artery disease, diabetes, and hypertension. He stated that plaintiff's motor strength was five out of five on both lower extremities and there was no evidence of muscle atrophy. (Tr. 273).

**6. RFC Assessments**

State agency physician Charles Wabner assessed plaintiff's physical RFC in October 2012. (Tr. 72-74). He reviewed plaintiff's records but did not examine plaintiff. He found that plaintiff could occasionally lift or carry up to twenty pounds, and could frequently lift or carry ten pounds. (Tr. 72). He stated plaintiff could sit, stand, or walk for about six hours in an eight hour day. Plaintiff could occasionally climb ramps, stairs, ladders, ropes, or scaffolds; balance; kneel; stoop; crouch; and crawl. (Tr. 73).

In March 2013, another state agency physician Dr. Phillip Galle completed a physical RFC assessment. (Tr. 82-83). His findings were the exact same as Dr. Wabner's and were based on plaintiff's medical records and consultative examination with Dr. Chapa. (Tr. 82-83).

## Analysis

Plaintiff claims the ALJ erred in analyzing the opinions of his treating physician, Dr. Frost.

The ALJ is required to consider a number of factors in weighing a treating doctor's opinion. The applicable regulation refers to a treating healthcare provider as a "treating source." The version of 20 C.F.R. §404.1527(c)(2) in effect at the time of the ALJ's decision states:

> Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. <u>If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.</u> [Emphasis added]

A treating doctor's medical opinion is entitled to controlling weight only where it is supported by medical findings and is not inconsistent with other substantial evidence in the record. ***Clifford v. Apfel*, 227 F.3d 863 (7th Cir. 2000); *Zurawski v. Halter*, 245 F.3d 881 (7th Cir. 2001).** Supportability and consistency are two important factors to be considered in weighing medical opinions. In a nutshell, "[t]he regulations state that an ALJ must give a treating physician's opinion controlling weight if two conditions are met: (1) the opinion is supported by 'medically acceptable clinical and laboratory diagnostic techniques[,]' and (2) it is 'not inconsistent' with substantial evidence in the record." ***Schaaf v. Astrue,* 602 F.3d 869, 875 (7th Cir. 2010), citing §404.1527(d).**

Thus, the ALJ can properly give less weight to a treating doctor's medical opinion if it is inconsistent with the opinion of a consulting physician, internally inconsistent, or inconsistent with other evidence in the record. *Henke v. Astrue*, **498 Fed.Appx. 636, 639 (7th Cir. 2012);** *Schmidt v. Astrue*, **496 F.3d 833, 842 (7th Cir. 2007).** In light of the deferential standard of judicial review, the ALJ is required only to "minimally articulate" his reasons for accepting or rejecting evidence, a standard which the Seventh Circuit has characterized as "lax." *Berger v. Astrue*, **516 F.3d 539, 545 (7th Cir. 2008);** *Elder v. Astrue*, **529 F.3d 408, 415 (7th Cir. 2008).**

ALJ Sayon met and exceeded this "lax" standard. She first noted that Dr. Frost was a physician that regularly treated plaintiff, but his opinions were not supported by his own treatment notes or the medical record as a whole. She acknowledged that Dr. Frost indicated on his opinions that plaintiff could not stand or walk for more than ten minutes during day and could only sit for one hour. ALJ Sayon then contrasted those opinions with Dr. Frost's notes where plaintiff occasionally had an antalgic gait, but by and large plaintiff's gait and station were normal, as were his muscles, joints, and bones. (Tr. 29).

Further, ALJ Sayon noted that Dr. Frost stated plaintiff had extreme limitations in his ability to function, but that plaintiff's medical history indicates plaintiff actively participated in cardiac rehabilitation in 2012 and 2013. The ALJ stated that Dr. Frost indicated plaintiff could only use his hands on an occasional basis but that Dr. Frost's treatment notes stated that plaintiff had no sensory deficits. Additionally, plaintiff's consultative examination

16

indicated he had a strong grip in both hands and had no difficulty performing tasks that involved fine and gross manipulation. (Tr. 29).

Plaintiff first argues that the ALJ's opinion was incorrect because Dr. Frost's opinions were supported by substantial evidence and the ALJ's determination. He states that Dr. Chapa's consultative examination supported Dr. Frost's opinions because plaintiff could not walk on his heels, had difficulty squatting and arising, and moderate difficulty walking on his toes. Plaintiff then points to the MRI taken in 2011 and specific portions of Dr. Frost's notes where plaintiff took medications, had hand numbness, and continued to have back pain. However, plaintiff fails to acknowledge that ALJ Sayon specifically discussed each of the portions of the record plaintiff says support her argument.

The ALJ talked about plaintiff's MRI results, the medications he took for his back pain, the fact that plaintiff wore a back corset, plaintiff's occasional antalgic gait, and plaintiff's statements that he could not perform any tasks. (Tr. 25-29). She also undertook an extensive review of Dr. Chapa's consultative examination. (Tr. 27). Plaintiff seems to focus on the specific portion of the ALJ's opinion where she discusses weighing Dr. Frost's opinions. He claims the ALJ "cherry-picked" portions of the record to arrive at her conclusion that plaintiff was not disabled. In weighing the medical opinions, the ALJ is not permitted to "cherry-pick" the evidence, ignoring the parts that conflict with his conclusion. ***Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009).** While he is not required to mention every piece of evidence, "he must at least minimally

discuss a claimant's evidence that contradicts the Commissioner's position." ***Godbey v. Apfel*, 238 F.3d 803, 808 (7th Cir. 2000).** However, when the ALJ's opinion is looked at as a whole it is clear the ALJ did not "cherry-pick" the evidence and she discussed facts that are in opposition to her final opinion.

Plaintiff then contends that the ALJ failed to provide adequate reasons for assigning Dr. Frost's opinions "no weight" because she failed to address all of the factors in §404.1527. He argues that the ALJ should have stated Dr. Frost was a treating physician. However, ALJ Sayon did acknowledge that Dr. Frost treated plaintiff on a regular basis. (Tr. 29). Plaintiff states that the ALJ should have acknowledged that Dr. Frost's opinions were consistent with one another. While Dr. Frost's four opinions regarding plaintiff's functional limitations may have been consistent, the ALJ did not find them to be consistent with the entire record. (Tr. 29). Further, the Seventh Circuit has held that an ALJ need not explicitly weigh every factor when deciding to reject a medical opinion and discussing only two of the factors may be sufficient. ***Henke v. Astrue*, 498 Fed.Appx. 636, 640 (7th Cir. 2012), *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).**

Plaintiff argues that the factors the ALJ did consider were insufficient. However, as noted above, supportability and consistency are two major factors and when they are fully discussed the "lax" standard may be met. ***Berger,* F.3d at 545; *Elder,* F.3d at 415.** Here, the ALJ looked at plaintiff's entire medical history and reasoned that his treatment records were inconsistent with Dr. Frost's opinions and were unsupported by the record as a whole.

18

Plaintiff argues that the ALJ's "other rationales are not 'good reasons'" because plaintiff's disability was focused on his back and the ALJ discussed the inconsistencies within the record regarding plaintiff's hands. However, Dr. Frost's opinions stated that plaintiff could barely use his hands in a work setting. (Tr. 411-13, 428-33). The ALJ found that the medical evidence did not support this, and as a result, undermined Dr. Frost's opinions as a whole. (Tr. 29).

Plaintiff takes issue with the ALJ assigning "great weight" to the opinions of the non-examining physicians. "State agency medical and psychological consultants are highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the Act." **Social Security Ruling 96-6p, at 2.** The ALJ is required by **20 CFR §§ 404.1527(f) and 416.927(f)** to consider the state agency physicians' findings of fact about the nature and severity of the claimant's impairment as opinions of non-examining physicians; while the ALJ is not bound by the opinion, he may not ignore it either, but must consider it and explain the weight given to the opinion in his decision. ***Ibid.*** Therefore, it was appropriate for ALJ Sayon to assign great weight to the opinions of these state agency physicians.

As an additional argument, plaintiff states that the ALJ erred in failing to discuss and assign weight to Dr. Chapa's consultative examination notes. Again, the Court notes that the ALJ did discuss the consultative examiner's notes. Moreover, the Seventh Circuit has held that when an evaluation does not include a functional assessment the report cannot be used to support

19

specific limitations within an RFC. ***Suide v. Astrue*, 371 Fed. Appx. 684, 690 (7th Cir. 2010).** Here, Dr. Chapa did not provide any functional limitations and the ALJ's failure to assign his opinion weight within the RFC is appropriate. Finally, the state agency physicians that provided RFC assessments used Dr. Chapa's consultative examination as a source for their opinions and, thus, Dr. Chapa's notes were eventually and appropriately incorporated into the ultimate RFC. (Tr. 72-74, 82-84).

In sum, none of plaintiff's arguments are persuasive. Even if reasonable minds could differ as to whether plaintiff was disabled at the relevant time, the ALJ's decision must be affirmed if it is supported by substantial evidence, and the Court cannot substitute its judgment for that of the ALJ in reviewing for substantial evidence. ***Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012)**; ***Elder*, 529 F.3d 413.** ALJ Sayon's decision is supported by substantial evidence, and so must be affirmed.

## Conclusion

After careful review of the record as a whole, the Court is convinced that ALJ Sayon committed no errors of law, and that her findings are supported by substantial evidence. Accordingly, the final decision of the Commissioner of Social Security denying Rodney Heinzmann's application for disability benefits is **AFFIRMED.**

The clerk of court shall enter judgment in favor of defendant.

**IT IS SO ORDRED.**

**DATE: August 23, 2016.**

**s/ Clifford J. Proud**

**CLIFFORD J. PROUD**

**UNITED STATES MAGISTRATE JUDGE**